IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Vernanza C. Gibson, | ) | C/A No.: 1:16-664-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

   This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Bruce Howe Hendricks dated July 14, 2016, referring this matter for disposition. [ECF No. 9]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

   Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On April 18, 2012, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on January 1, 2009. Tr. at 98, 99, 237–43, and 244–49. His applications were denied initially and upon reconsideration. Tr. at 142–46, 147–51, 157–59, and 160–62. On April 17, 2014, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Peggy McFadden-Elmore. Tr. at 30–61 (Hr'g Tr.). The ALJ issued an unfavorable decision on October 29, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–29. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 1, 2016. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 47 years old at the time of the hearing. Tr. at 34. He was promoted to the tenth grade, but did not complete it. Tr. at 36. His past relevant work ("PRW") was as a welder. Tr. at 37. He alleges he has been unable to work since January 1, 2009. Tr. at 237 and 244.

2.    Medical History

Plaintiff presented to the emergency room ("ER") at Palmetto Health Baptist ("PHB") on August 1, 2009. Tr. at 335. He reported fleeting thoughts of suicide, but was

laughing and smiling. *Id.* Ricky A. Ladd, M.D. ("Dr. Ladd"), assessed alcohol intoxication and depression and referred Plaintiff to the Lexington/Richland Alcohol and Drug Abuse Council ("LRADAC"). Tr. at 336.

Plaintiff again presented to the ER at PHB on April 8, 2010, with symptoms of pancreatitis. Tr. at 340. He indicated he continued to drink alcohol, despite a history of pancreatitis. *Id.* Hubert D. Sammons, M.D. ("Dr. Sammons"), urged Plaintiff to stop drinking and smoking cigarettes and prescribed Phenergan and Vicodin. Tr. at 341.

Plaintiff presented to the ER at Palmetto Health Richland ("PHR") complaining of left foot pain on June 11, 2010. Tr. at 343. Jeremy Ryan Smith, M.D. ("Dr. Smith"), indicated Plaintiff had a history of coronary artery disease and myocardial infarction. *Id.* He observed Plaintiff to have some tenderness over the third and fourth metatarsals of his left foot. Tr. at 344. Dr. Smith assessed a chronic healing scar and advised Plaintiff to follow up with his primary care doctor. *Id.*

On July 10, 2010, Plaintiff returned to PHR with worsening of the left foot wound. Tr. at 351. He stated he felt like something was inside the wound and had "seen what had appeared to be worms crawling out" of it. *Id.* Jeter P. Taylor, III, M.D. ("Dr. Taylor"), observed the wound to have some mild erythema surrounding it and to have larvae within it. Tr. at 352. Catherine L. Loflin, M.D. ("Dr. Loflin"), performed a shallow debridement procedure. Tr. at 355–56. She indicated Plaintiff should change his wound dressings twice a day and should use postoperative shoes, but would not require vascular follow up. Tr. at 356.

Plaintiff was hospitalized at Morris Village Alcohol and Drug Addiction Treatment Center ("Morris Village") from August 31 through October 4, 2011. Tr. at 389. He indicated he had started drinking at the age of 12 and that his drinking had become problematic at age 30. *Id.* He indicated he had a history of alcohol-related seizures and had recently developed distortions of his face, mouth, and eyes. *Id.* Upon discharge, Plaintiff was encouraged to attend Alcoholics Anonymous Meetings, to obtain a sponsor, to seek individual or group therapy, to secure a group home, and to get a job and practice responsible behaviors. Tr. at 402.

Plaintiff visited Pamela Carlton, Ph. D. ("Dr. Carlton"), for an adult psychological evaluation on August 28, 2012. Tr. at 361–68. He reported symptoms of depression and described a history of abuse and tragic deaths within his family. Tr. at 362. He denied problems getting along with coworkers and supervisors. Tr. at 364. He stated he enjoyed making people laugh, but had no friends and preferred to keep to himself. *Id.* After interviewing claimant and assessing his intelligence quotient ("IQ") on the Fourth Edition of the Wechsler Adult Intelligence Scale ("WAIS-IV") and his mathematical and reading levels on the Fourth Edition of the Wide Range Achievement Test ("WRAT-4"), Dr. Carlton concluded that he appeared to have mild difficulties handling typical ADLs; would likely have difficulty concentrating and persisting at a task for more than an hour; and would likely require assistance to handle funds.[1] Tr. at 367. However, she noted Plaintiff had no limitations in his ability to function in a socially-appropriate manner in a

---

[1] Information in Dr. Carlton's report that is relevant to Plaintiff's IQ score and adaptive functioning are set forth in detail below.

work setting. *Id.* She assessed alcohol dependence in remission; cognitive disorder, not otherwise specified ("NOS"); and post-traumatic stress disorder ("PTSD"). *Id.*

Plaintiff presented to Damon Daniels, M.D. ("Dr. Daniels"), for a consultative examination on August 30, 2012. Tr. at 370–73. He reported having sustained a heart attack nine years earlier. Tr. at 370. He endorsed progressive shortness of breath and chest pain with exertion. *Id.* He reported a history of chronic abdominal pain and pancreatitis. *Id.* He endorsed a history of alcohol abuse, but indicated he had been clean since his hospitalization at Morris Village, aside from a brief relapse. *Id.* He reported tremors and cramps in his feet. Tr. at 371. He stated he smoked half a pack of cigarettes daily and had last consumed alcohol six months earlier. *Id.* Plaintiff weighed 136 pounds and was 5' 11 ½" tall. *Id.* He had 1+ pitting edema in his bilateral lower extremities. *Id.* He moved from the chair to the exam table without difficulty, but was unable to tandem or heel-to-toe walk and had difficulty squatting. *Id.* He had normal range of motion in his cervical spine, lumbar spine, shoulders, elbows, wrists, knees, hips, and ankles. Tr. at 372. He had 4/5 grip strength and intact fine and gross manipulation bilaterally. *Id.* He had 4/5 strength in the proximal and distal muscle groups of his upper extremities and 3/5 strength in the proximal and distal muscle groups of his lower extremities. *Id.* He had diminished sensation to light touch and pinprick on the dorsal and plantar surfaces of his bilateral feet. *Id.* He scored 22 of out 30 points on the Mini-Mental State Exam ("MMSE") and demonstrated deficits in attention, calculation, recall, and language. *Id.* Dr. Daniels assessed coronary artery disease, alcohol abuse, chronic pancreatitis, memory

loss, and alcoholic neuropathy. *Id.* He stated Plaintiff's "primary issues are that of his balance and gait." Tr. at 373.

On September 4, 2012, Jody Lenrow, Psy. D. ("Dr. Lenrow"), completed a psychiatric review technique form ("PRTF"). Tr. at 67–71. She considered Listings 12.02 for organic mental disorders, 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.09 for substance addiction disorders and determined that Plaintiff had moderate restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 67–68. Dr. Lenrow wrote the following:

> CL has long hx of alcohol dependence as well as PTSD, BIF[2]/cognitive d/o NOS, and hx of mood px associated w alcohol. He reports he is no longer consuming alcohol. CE notes IQ scores ranging 65–74 with consistent achv scores. Functionally, he has a long work hx, including welder, landscaper, and meat cutter/stocker. He has no px socially, mild to moderate px with ADL's, but some moderate px with CP&P. He retains the ability to perform simple repetitive work related tasks.

Tr. at 69. She also indicated she found Plaintiff's statements about his impairments and functional limitations to be partially credible because his unusual answers during the consultative examination raised the possibility that he might not have been putting forth adequate effort. Tr. at 70. She cited Plaintiff's work history and daily activities and concluded that he was likely "functioning at the BIF level" and would likely have problems with written instructions and keeping up pace with his coworkers. Tr. at 70–71. However, she concluded Plaintiff was capable of performing simple, repetitive tasks. Tr. at 71. She found that Plaintiff was moderately limited with respect to the following

---

[2] "BIF" is the abbreviation for "borderline intellectual functioning."

mental abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. Tr. at 73–75. Timothy Laskis, Ph. D. ("Dr. Laskis"), indicated the same degree of limitation and restrictions in a PRTF and mental RFC evaluation on February 21, 2013. Tr. at 106–08 and 113–15.

Plaintiff presented to the ER at Providence Hospital on September 10, 2012, with a complaint of left foot pain. Tr. at 375. Cale Michael Davis, M.D. ("Dr. Davis"), observed Plaintiff to have soft tissue tenderness and erythema in his left foot. Tr. at 378. He diagnosed early cellulitis and prescribed an antibiotic. *Id.*

On September 26, 2012, state agency consultant Lindsey Crumlin, M.D. ("Dr. Crumlin"), reviewed the evidence and assessed Plaintiff's physical residual functional capacity ("RFC"). Tr. at 72–73. She indicated Plaintiff was capable of performing work with the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or

scaffolds. *Id.* Darla Mullaney, M.D. ("Dr. Mullaney"), assessed the same physical RFC on February 21, 2013. Tr. at 111–13.

Plaintiff presented to Kim E. Davis, D.O. ("Dr. Davis"), to establish care on October 29, 2012. Tr. at 415–22. He complained of a wound on his left foot that had failed to heal, bilateral foot numbness, chest pain, shortness of breath, dyspnea on exertion, orthopnea, and vitiligo. Tr. at 416. Dr. Davis debrided and cleaned a six-centimeter wound to Plaintiff's left foot and referred him for a deep debridement procedure. Tr. at 419. She prescribed Coreg and instructed Plaintiff to obtain it through Well Vista. Tr. at 420.

On November 5, 2012, Plaintiff underwent surgical wound exploration and excision of a two-centimeter left foot abscess. Tr. at 409. He followed up with Dr. Davis on November 21, 2012. Tr. at 423. He reported his left foot wound was feeling much better. *Id.* He complained of paresthesias in his bilateral distal toes. Tr. at 424. Dr. Davis debrided some necrotic tissue at the base of Plaintiff's wound. Tr. at 425. She refilled Plaintiff's prescription for Doxycycline for two more weeks and instructed him to continue using wet-to-dry dressings. Tr. at 423. She noted Plaintiff had not started Coreg because he had neglected to apply for Well Vista. Tr. at 424. She referred Plaintiff to a cardiologist to address his complaints of chest pain, shortness of breath, orthopnea, and dyspnea on exertion. *Id.*

On November 29, 2012, Plaintiff reported having sustained a fall and injured his left side on the prior day. Tr. at 429. Dr. Davis noted that Plaintiff had not been taking his antibiotic medication, despite the fact that it was available for free at Publix and was not

taking Coreg because he had not completed the paperwork for Well Vista. Tr. at 429 and 430. Plaintiff informed Dr. Davis that he was not taking aspirin because his family members would not lend him a dollar to purchase it. Tr. at 430. Dr. Davis debrided Plaintiff's left foot wound and changed his dressing. Tr. at 431. She noted Plaintiff's sensation was diminished to pinprick in his bilateral distal toes. *Id.*

Plaintiff followed up with Dr. Davis on January 16, 2013. Tr. at 434. He reported he was unable to obtain his prescribed medications and indicated Doxycycline was no longer free at Publix. *Id.* However, Dr. Davis noted that Plaintiff filled his prescription for Percocet and continued to drink alcohol. *Id.* Plaintiff complained of paresthesias in his bilateral feet. *Id.* Dr. Davis observed Plaintiff's left foot wound to be "[m]uch improved over previous." Tr. at 436.

Plaintiff presented to the ER at Providence Hospital on April 8, 2014, complaining of abdominal pain, nausea, and vomiting. Tr. at 447. He stated he developed symptoms after having consumed alcohol four days earlier. Tr. at 450. Joshua Philip Baird, M.D. ("Dr. Baird"), diagnosed acute pancreatitis. Tr. at 453. Georges T. Postic, M.D. ("Dr. Postic"), discovered a gastric mass, but indicated it was likely benign. Tr. at 456.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on April 17, 2014, Plaintiff testified he worked as a welder at CMC Steel Fabricators. Tr. at 37. He indicated the work was placed in front of him and he operated the welding equipment. Tr. at 47. He stated he left the job because the plant shut

down. Tr. at 37. He denied having worked or collected unemployment benefits since January 1, 2009. *Id.*

Plaintiff testified that he had recently been hospitalized for pancreatitis. Tr. at 41. He described his pancreatitis as causing pain and cramping and indicated his symptoms occurred nearly every other day and were exacerbated by bending down. Tr. at 49. He endorsed pain in his feet and his back. Tr. at 45. He endorsed problems with concentrating and completing tasks. Tr. at 46. He stated his mind often wandered. *Id.* He indicated he experienced hallucinations approximately twice a month. Tr. at 47. He stated his right hand was shaky. Tr. at 47–48. He indicated he had numbness and sharp pain in his bilateral feet. Tr. at 48. He testified he had sustained some falls and had blackouts or fainting spells two to three times per month. Tr. at 48 and 50.

Plaintiff testified that his driver's test had been administered orally. Tr. at 49. He denied having the ability to read the questions on the driver's examination. *Id.* He indicated he could perform some simple math, but would likely fail a math test. Tr. at 51.

Plaintiff mentioned taking Nitroglycerin and aspirin and later stated he was taking Lisinopril and Prilosec. Tr. at 40. He stated he had difficulty obtaining his medications because he had no transportation. Tr. at 42.

Plaintiff estimated he was able to walk 30 yards and stand for 15 to 20 minutes at a time. Tr. at 45. He indicated he had difficulty sitting for more than 25 to 30 minutes. *Id.*

Plaintiff testified that he had stopped drinking for approximately three months after having been discharged from Morris Village in October 2011. Tr. at 38–39. He stated he had a relapse during a friend's birthday party and continued to drink for two to

three days. Tr. at 39. He indicated he had last consumed alcohol a month to a month-and-a-half earlier. *Id.*

Plaintiff testified he lived in a mobile home with his two adult nephews. Tr. at 35 and 42. He denied doing household chores and indicated his sister sometimes came over to check on him and to do his laundry and other chores. Tr. at 43. He stated another sister drove him to the grocery store every other month. Tr. at 44. He testified he attended church twice a month. Tr. at 44–45. He testified he watched television during a typical day and sometimes walked two doors down to his sister's trailer. Tr. at 43. He indicated he smoked eight to 10 cigarettes per day. Tr. at 37. He indicated his driver's license had been suspended seven or eight years earlier because he was convicted of driving under the influence ("DUI"). Tr. at 36. He stated he traveled by bus to his attorney's office and rode with his attorney to the hearing. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert E. Brabham, Sr., Ph. D., reviewed the record and testified at the hearing. Tr. at 52. The VE categorized Plaintiff's PRW as a tack welder, *Dictionary of Occupational Titles* ("*DOT*") number 810.684-010, as heavy with a specific vocational preparation ("SVP") of five. Tr. at 53. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand and/or walk for about six hours in an eight-hour workday; could not use his left lower extremity to operate foot controls; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to hazards;

was limited to unskilled work that required little or no written instructions or math skills;
and was likely to miss three or more days per month because of alcohol abuse. Tr. at 54.
The VE testified that the hypothetical individual would be unable to perform Plaintiff's
PRW or any other work. Tr. at 54–55.

For a second hypothetical question, the ALJ described an individual of Plaintiff's
vocational profile who could lift or carry 20 pounds occasionally and 10 pounds
frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about
six hours in an eight-hour workday; should not use his left foot to operate foot controls;
should never climb ladders, ropes, or scaffolds; should occasionally climb ramps and
stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to
hazards; and would be limited to jobs with little to no written instructions or math. Tr. at
55. The VE testified the individual would be unable to perform Plaintiff's PRW, but
could perform light work with an SVP of two as an assembler, *DOT* number 739.687-
078, with 9,000 positions in South Carolina and 360,000 positions in the national
economy, and a packager, *DOT* number 753.687-038, with 10,000 positions in South
Carolina and 400,000 positions in the national economy. Tr. at 56–57.

For a third hypothetical question, the VE described an individual of Plaintiff's
vocational profile who could lift or carry 10 pounds occasionally and less than 10 pounds
frequently; could stand or walk for at least two hours in an eight-hour workday; could sit
for about six hours in an eight-hour workday; should avoid use of foot controls with the
left lower extremity; should never climb ladders, ropes, or scaffolds; could occasionally
climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; should avoid

concentrated exposure to hazards; and was limited to unskilled work that required little to no written instructions or math skills. Tr. at 57. The VE testified the individual would be unable to perform Plaintiff's PRW, but could perform sedentary jobs with an SVP of two as an assembler, *DOT* number 739.687-086, with 2,000 jobs in South Carolina and 80,000 jobs nationally, and a hand packer, *DOT* number 589.687-015, with 5,000 positions in South Carolina and 200,000 positions in the national economy. Tr. at 57–58.

For a fourth hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as stated in Plaintiff's testimony. Tr. at 58. The VE testified the individual would be unable to maintain employment. Tr. at 58–59.

Plaintiff's attorney asked the VE to consider an individual of Plaintiff's vocational profile who had mild restriction of ADLs as a result of his mental problems. Tr. at 59. He asked the VE if the individual could perform any jobs in the economy. *Id.* The VE indicated that if the individual were unable to do things even around his own home and could not go places to do things, he would be unable to work. *Id.*

Plaintiff's attorney asked the VE to assume the individual had difficulty persisting at tasks for at least an hour. Tr. at 59–60. The VE stated an individual would be expected to persist at any activity for a two hour period before taking a break. Tr. at 60. He indicated the individual could not perform jobs if he could not persist at tasks for an hour. *Id.*

2.      The ALJ's Findings

In his decision dated October 29, 2014, the ALJ made the following findings of

fact and conclusions of law:

1.      The claimant met the insured status requirements of the Social Security Act through September 30, 2010.

2.      The claimant has not engaged in substantial gainful activity since January 1, 2009, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b), and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: peripheral neuropathy, borderline intellectual functioning, post-traumatic stress disorder, history of coronary artery disease, alcohol induced seizures and current alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5.      After careful consideration of the entire record, I find that, based on all of the impairments, including the substance use disorder, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant cannot use controls with his left lower extremity, he cannot climb ladders, ropes or scaffolds, and he can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. He must avoid concentrated exposure to hazards. The claimant can perform unskilled work requiring little to no written instructions or math skills. He is likely to miss 3 or more days of work per month due to alcohol abuse and alcohol blackouts.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on May 25, 1966 and was a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity based on all of the impairments, including the substance use disorder, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.     If the claimant stopped the substance use, the remaining limitations would cause more than minimal impact on the claimant's ability to perform basic

work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

12.    If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

13.    If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant could not use his left lower extremity for foot controls, he could not climb ladders, ropes, or scaffolds, and he could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. He would have to avoid concentrated exposure to hazards. The claimant could perform unskilled work requiring little to no written instructions or math skills.

14.    If the claimant stopped the substance use, the claimant would continue to be unable to perform past relevant work (20 CFR 404.1565 and 416.965).

15.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

16.    If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

17.    The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g), 404.1535, 416.920(g) and 416.935). Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

Tr. at 13–24.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ erred in failing to find that Plaintiff met the requirements for a finding of disability under Listing 12.05C; and

2)    the ALJ did not adequately consider the effects of Plaintiff's peripheral neuropathy in evaluating his credibility and RFC.

15

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525 and 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§

impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520 and 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b) and 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant

---

404.1520(a)(4)(iii) and 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526 and 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h) and 416.920(h).

can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–

1:16-cv-00664-SVH    Date Filed 12/13/16    Entry Number 22    Page 19 of 29

58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483

F.2d 773, 775 (4th Cir. 1972).

      B.     Analysis

         1.     Listing 12.05C

Plaintiff argues the ALJ erred in failing to find he was disabled under part C of

Listing 12.05. [ECF No. 13 at 2]. He maintains that two IQ tests of record showed him to

have an IQ between 60 and 70 and that the ALJ did not explain her decision to give the

IQ scores little weight. *Id.* at 2–3. He contends he had other severe impairments that

included peripheral neuropathy and PTSD and was limited to performing work at the

light exertional level. *Id.* at 2. He argues he had deficits in adaptive functioning, as

required for a finding of disability under part C of Listing 12.05. *Id.* at 2 and 4–5.

The Commissioner argues Plaintiff failed to prove that he had deficits in adaptive

functioning that manifested during the developmental period. [ECF No. 14 at 18]. She

maintains the ALJ properly considered Plaintiff's work history as a welder and his skills

as a landscaper, farmer, and carpenter in concluding that he lacked deficits in adaptive

functioning. *Id.* at 1. She contends the court has repeatedly upheld ALJs' findings that

claimants lacked deficits in adaptive functioning where the claimants had histories of

semiskilled and skilled work. *Id.* at 18–19. She argues the ALJ also considered Plaintiff's

other activities in determining that he did not have deficits in adaptive functioning. *Id.* at

19

19–20. She further maintains the ALJ properly found Plaintiff's IQ scores to be invalid because they were inconsistent with the evidence of his functioning. *Id.* at 20–21.

Plaintiff argues that the Commissioner has attempted to explain the ALJ's conclusions regarding consideration of his IQ and deficits in adaptive functioning, but that the court should reject the Commissioner's *post hoc* rationalization because the ALJ failed to provide such explanation. [ECF 19 at 2–9].

An ALJ "must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000), citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986) (remanded, in part, because of ALJ's failure to specifically identify relevant Listing and compare each of the Listed criteria to the evidence of the claimant's symptoms). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* "In order to meet a Listing, every element of the listing must be satisfied." *Id., citing Sullivan v. Zebley*, 493 U.S 521, 531 (1990).

To establish disability under paragraph C of Listing 12.05, a claimant must prove "deficits in adaptive functioning generally," a "deficiency" that "manifested itself before the age of 22," a "valid verbal, performance, or full scale IQ of 60 through 70," and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012); 20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.05C.

"Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012), citing *Atkins*, 536 U.S. 304, 309 n.3 (2002). The Supreme Court has held that intellectual disability is characterized by "significant limitations" in at least two of the areas of adaptive functioning in conjunction with significantly subaverage general intellectual functioning. *Atkins*, 536 U.S. at 309 n.3. In *Weedon v. Astrue*, No. 0:11-2971-DCN-PJG, 2013 WL 1315311, at *5–6 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013), the court identified the following factors that other courts have deemed important for ALJs to consider in determining whether an individual has deficits in adaptive functioning under Listing 12.05: the individual's actual IQ score; the individual's diagnosis; whether the individual is illiterate; whether the individual has ever lived independently; whether the individual has ever provided care for others or whether he is dependent on others for care; school records and past academic performance; work history; and the tasks the individual is able to undertake.

"Once it is established that the claimant's IQ falls within the range required by § 12.05C, the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions." *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984); 20 C.F.R., Pt. 404, Subpart. P, App'x 1, § 12.05C.

The court has considered only the ALJ's explanation of her finding that Plaintiff's impairments were not disabling under Listing 12.05C and has rejected the

Commissioner's explanations that were not set forth by the ALJ. *See Hall v. Colvin*, No. 8:13-2509-BHH-JDA, 2015 WL 366930, at *11 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7 n.4 (D.S.C. Mar. 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The ALJ concluded that Plaintiff's impairments did not meet or medically equal the requirements of Listing 12.05. Tr. at 14. She determined Plaintiff did not meet the paragraph C criteria under the Listing because he did not have "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Tr. at 15–16 and 21. She stated she "gave little weight to the full-scale IQ score of 65 that the claimant obtained during the psychological consultative examination." Tr. at 16 and 21. She concluded that Plaintiff "clearly has significant adaptive functioning abilities" and cited Exhibits 19E and 7F. Tr. at 16.

The court finds the ALJ erred in evaluating whether Plaintiff's impairments met the requirements for a finding of disability under Listing 12.05C. The record contains evidence that arguably suggests Plaintiff met the Listing in the form of IQ test results between 60 and 70; a showing of academic deficits during the developmental period; dependency on others for care; inability to perform some basic tasks; and additional impairments that significantly reduced his work-related functions. Therefore, the ALJ was required to compare the signs and symptoms of Plaintiff's impairment and functional

limitations with the criteria set forth in the Listing. *See Cook*, 783 F.2d at 1172; *Huntington*, 101 F. Supp. 2d at 390. Although the ALJ purported to consider the criteria under Listing 12.05C, she did not adequately address the conflicting evidence or evaluate all of the relevant criteria in concluding that Plaintiff was not disabled.

Exhibit 19E contains school records from Richland County District One that reflect Plaintiff to have been retained in the sixth grade; to have received primarily Ds and Fs in his academic courses; to have been enrolled in "basic" and "practical" courses; and to have scored significantly below average on standardized tests. Tr. at 319–26. Plaintiff's academic records show an assessed verbal IQ of 61, nonverbal IQ of 63, and full scale IQ of 60 in October 1975.[5] Tr. at 323. The records do not indicate Plaintiff was enrolled in special education classes. Tr. at 319–26.

Dr. Carlton's evaluation appears at Exhibit 7F. Tr. at 361–68. She indicated she considered the results of testing to be valid. Tr. at 361 and 366. During the interview, Plaintiff stated he currently lived with a nephew, but had moved from house-to-house over the prior 15-year period. Tr. at 361. He indicated he was removed from school in the eleventh grade, but could not confirm whether he was enrolled in regular classes on a basic level or special education classes. Tr. at 363. He reported performing a welding job, after acquiring on-the-job training. *Id.* He stated he had previously enjoyed landscaping and farming work. *Id.* He indicated that he typically prepared his coffee each morning, but sometimes asked his nephew to prepare it. Tr. at 364. He stated he spent most of his days watching television at his home or his sister's home and sitting on the porch. *Id.* He

---

[5] Plaintiff was born on May 25, 1966, and was nine years old at the time of the IQ assessment. Tr. at 237.

23

denied performing household chores, aside from keeping his bathroom clean and placing his clothes in a hamper. *Id.* He indicated he could prepare a bowl of cereal and could sometimes fry an egg. *Id.* He denied driving and indicated his sister purchased groceries for him. *Id.* He was able to calculate change from a purchase. *Id.* Dr. Carlton indicated Plaintiff understood and followed directions and maintained good focus with one-on-one attention for two-and-a-half hours. Tr. at 365. Although Plaintiff was "persistent to the end," he "struggled to provide correct answers on the Sentence Comprehension test." Tr. at 366. He obtained a full scale IQ score of 65, a verbal comprehension score of 68, a perceptual reasoning score of 73, a working memory score of 66, and a processing speed score of 74 on the WAIS-IV. *Id.* His scores on the WRAT-4 showed him to engage in word reading at a high third grade level, in sentence comprehension at a high fifth grade level, and in math computation at a high second grade level. Tr. at 367. Dr. Carlton noted that results of the WRAT-4 and WAIS-IV were comparable among subtests. *Id.* She stated Plaintiff's scores were consistent with his poor level of self-sufficiency and his vocational background, except for his last job as a welder. *Id.*

The ALJ did not adequately consider whether Plaintiff had a valid IQ score between 60 and 70. Despite referencing the school records as providing support for her finding that Plaintiff's impairments did not meet Listing 12.05C (Tr. at 16), the ALJ erred in failing to evaluate the IQ scores that appeared in the records. *See Odom v. Colvin*, No. 1:14-576-JMC, 2015 WL 3560685, at *4 (D.S.C. Jun. 5, 2015) (finding the ALJ erred in failing to weigh an IQ test in the plaintiff's school records), citing *Gordon v. Schweiker*,

725 F.2d 231 (4th Cir. 1984) (providing that an ALJ must explicitly state "the weight given to all relevant evidence").

The Commissioner argues that the Fourth Circuit's holding in *Hancock* provides support for the ALJ's decision to invalidate the scores Dr. Carlton assessed. [ECF No. 14 at 21]. In *Hancock*, 667 F.3d at 474, the court held that "an ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." The court acknowledged "certain failures of the test examiner" to "attest to the validity of the test results or opine that Hancock gave her best efforts." *See Hancock*, 667 F.3d at 474. However, these failures were not present in the instant case. Dr. Carlton attested to the validity of the scores she assessed and indicated Plaintiff gave his best effort. Tr. at 361, 366, and 367.

It appears the ALJ rejected the scores Dr. Carlton assessed because she did not find them to be consistent with Plaintiff's adaptive functioning. *See* Tr. at 16 and 21. She indicated Plaintiff "clearly has a significantly higher adaptive functioning as he has significant work history as well as some landscaping and farming for several years." Tr. at 16. She found that he had no deficit in functional academic skills because it was "unclear whether he was actually in special education." Tr. at 16.

The ALJ's decision does not reflect that she weighed all the evidence that pertained to Plaintiff's adaptive functioning abilities. *See Atkins*, 536 U.S. at 309 n.3; *Jackson*, 467 F. App'x at 218; *Weedon*, 2013 WL 1315311, at *5–6. The ALJ considered only Plaintiff's academic and work histories in concluding that he lacked deficits in adaptive functioning. *See* Tr. at 16. However, the record suggested that Plaintiff had

deficits in other areas of adaptive functioning. *See* Tr. at 361 (reporting he lived with his nephews, but had "spent 15 years going from house to house"), 364 (indicating his nephew performed household chores and his sister shopped for his groceries), 365–67 (showing good effort, but poor test performance), and 372 (noting Plaintiff scored 22 out of 30 points on the MMSE and had some deficits in attention, calculation, recall, and language).

The ALJ's conclusion that Plaintiff lacked deficits in functional academic skills was not supported by substantial evidence. The ALJ cited evidence that suggested Plaintiff might have such deficits. *See* Tr. at 15 (noting that Dr. Daniels observed Plaintiff to score 22 out of 30 on the MMSE and that Dr. Carlton assessed him to score extremely low in the working memory index and in the borderline range in the processing speed index and to be performing math on a high second grade level) and 16 (stating that Plaintiff repeated the sixth grade and earned poor grades in school). However, she perfunctorily concluded that Plaintiff lacked deficits in functional academic skills because his school records were "unclear" as to whether he was enrolled in special education classes. Tr. at 16.

The ALJ did not resolve the conflicting evidence regarding Plaintiff's PRW as a welder. The Commissioner correctly asserts that this court has traditionally upheld ALJs' findings that plaintiffs lacked deficits in adaptive functioning where the plaintiffs were able to perform skilled and semiskilled work. *See Hightower v. Colvin*, No. 1:14-2761-RBH, 2015 WL 5008713, at *7 (D.S.C. Aug. 20, 2015); *Weatherford v. Colvin*, No. 6:13-1885-RMG, 2014 WL 3881056, at *10 (D.S.C. Aug. 5, 2014); *Weedon*, 2013 WL

1315311, at *7; *Sims v. Colvin*, No. 6:12-3332-DCN, 2014 WL 793065, at *11 (D.S.C. Feb. 24, 2014). However, the record contains conflicting information on whether Plaintiff's work as a welder was skilled or unskilled. The VE who testified at the hearing categorized Plaintiff's PRW as a tack welder, *DOT* number 810.684-010, and indicated the work was skilled with an SVP of five. Tr. at 53. However, VE J. Adger Brown, Jr., MA, CDMS ("Mr. Brown"),[6] classified Plaintiff's PRW as that of a structural steel welder, *DOT* number 819.684-010, and indicated the work was unskilled with an SVP of two. Tr. at 331. The ALJ concluded that Plaintiff's PRW included a job as a tack welder/gas welder (*DOT* number 810.684-010), with an SVP of five, as identified by the VE at the hearing. *See* Tr. at 18. However, she neither identified the conflict between the VE's testimony and Dr. Brown's report, nor explained how she resolved the conflict in favor of the VE's opinion. Thus, substantial evidence did not support the ALJ's reliance on Plaintiff's PRW to find he lacked deficits in adaptive functioning.

Finally, the court notes that the parties do not dispute whether Plaintiff had an additional physical or mental impairment that significantly limited his work-related functions. The ALJ's finding that that Plaintiff's severe impairments included peripheral neuropathy, PTSD, and a history of coronary artery disease (Tr. at 14) and that he was limited to light work with additional limitations (Tr. at 21) appears to satisfy this requirement of the Listing.

---

[6] On March 17, 2014, Mr. Brown prepared a report and provided a vocational opinion that was based on a clinical interview, Plaintiff's school records, treatment records from Morris Village, records from Providence Internal Medicine, records from Palmetto Health Baptist Hospital, a psychological consultation with Dr. Carlton, and a medical consultation with Dr. Daniels. Tr. at 329.

Therefore, the court considers remand appropriate in light of the ALJ's failure to address and resolve evidence that arguably suggested Plaintiff met the requirements for a finding of disability under Listing 12.05C.

### 2.    Additional Allegations of Error

Plaintiff argues the ALJ did not consider the effects of neuropathy and did not comply with the provisions of SSRs 96-7p, 96-8p, and 16-3p in assessing his credibility and his RFC. [ECF No. 13 at 5–13]. The Commissioner maintains the ALJ appropriately evaluated Plaintiff's credibility and RFC and cited sufficient evidence to support her conclusions. [ECF No. 14 at 23–32]. Because the court finds the ALJ's failure to properly evaluate Plaintiff's impairments at step three to be a sufficient basis for remand, the court declines to address Plaintiff's additional allegations of error. However, if the ALJ finds that Plaintiff does not meet Listing 12.05C on remand and proceeds to steps four and five, she should evaluate Plaintiff's credibility and RFC in accordance with SSRs 96-8p and 16-3p.[7]

### III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this

---

[7] The Social Security Administration recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p, eliminates use of the term "credibility," and clarifies that subjective symptom evaluation is not an examination of an individual's character. Although SSR 16-3p eliminates the assessment of credibility, it requires evaluation of most of the same factors to be considered under SSR 96-7p.

matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

    IT IS SO ORDERED.

December 13, 2016               Shiva V. Hodges
Columbia, South Carolina        United States Magistrate Judge